**CHECKER MOTORS CORPORATION, Plaintiff-Appellant,**

**v.**

**CHRYSLER CORPORATION and Chrysler Motors Corporation, Defendants-Appellees,**

**Checker Taxi Company, Inc., et al., Additional Defendants on Counterclaim.**

**No. 81, Docket 32406.**

United States Court of Appeals Second Circuit.

Argued Oct. 16, 1968.

Decided Jan. 6, 1969.

See also D.C., 39 F.R.D. 37.

Jesse Climenko, Shea, Gallop, Climenko & Gould, New York City, for plaintiff-appellant.

Robert Ehrenbard, Clark J. Gurney, Dale A. Schreiber, Kelley, Drye, Newhall, Maginnes & Warren, New York City, for defendants-appellees.

Before WATERMAN and MOORE, Circuit Judges, BONSAL, District Judge.[*]

WATERMAN, *Circuit Judge*:

Plaintiff, Checker Motors Corporation (Checker), is a New Jersey corporation engaged principally in the production and sale of the familiar "Checker" taxicabs. The defendants, Chrysler Corporation, the third largest automobile manufacturer in the United States, and its wholly owned sales subsidiary, Chrysler Motors Corporation (Chrysler), are competitors of Checker in the taxicab market. In April 1964 Checker, pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, commenced a private suit for treble damages and injunctive relief, alleging numerous violations by the defendants of the antitrust laws. The instant appeal, however, deals only with the legality of a national rebate plan (Commercial Fleet Value Program) employed by Chrysler since 1962 whereby the purchase of a taxicab from any authorized Chrysler dealer entitles the buyer to receive an automatic cash rebate.[1]

---

[*] Of the Southern District of New York, sitting by designation.

[1] In 1962 when the Commercial Fleet Value Program was initially instituted, pur-

The plan operates without any participation by Chrysler dealers; upon application to Chrysler by purchasers of commercial fleet vehicles the cash discount, a sum which is not contingent upon the purchase price charged by the dealer, is paid to the buyers directly by Chrysler. The dealers do, however, partake in some of the advertisement of the program.

In the court below Checker moved for partial summary judgment. It claimed that the rebate plan as used in the New York City market[2] constituted (1) a per se price-fixing violation of § 1 of the Sherman Act, 15 U.S.C. § 1; and (2) a discriminatory pricing arrangement in violation of § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a). Additionally, as an alternative to its motion for partial summary judgment, Checker sought a preliminary injunction enjoining Chrysler from maintaining the rebate plan during the pendency of the litigation. Judge Mansfield of the United States District Court for the Southern District of New York denied both the motion for partial summary judgment and the motion for a preliminary injunction *pendente lite*. Judge Mansfield's opinion is reported at 283 F.Supp. 876 (SDNY 1968). Pursuant to 28 U.S.C. § 1292(a) (1), Checker now appeals the portion of the district court's order that denied the preliminary injunction. Our review is limited accordingly.

The district court held that the charge that Chrysler's rebate plan violates the Robinson-Patman Act is a question of fact to be determined at trial. Checker does not quarrel with that part of the decision below, and therefore we need not concern ourselves with the district court's disposition of the Robinson-Patman claim. Rather, in reviewing the propriety of the district court's denial of Checker's request for a preliminary injunction, only two questions warrant our attention:

(1) Is Chrysler's rebate plan a price-fixing arrangement, and thus, illegal per se under § 1 of the Sherman Act; if so plaintiff may have been entitled to final judgment on the merits;[3] and

(2) If the plan is not illegal per se did the district court abuse its discretion in declining to enjoin use of it pending a further test of the plan's legality at trial. For the reasons to follow, we answer both questions in the negative and affirm the decision below.

A lengthy discussion is unnecessary. The per se illegality of price-fixing agreements under the Sherman Act is a principle to which our courts have consistently adhered. See United States v. New Wrinkle, Inc., 342 U.S. 371, 377, 72 S.Ct. 350, 96 L.Ed. 417(1952); United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 489, 70 S.Ct. 711, 94 L.Ed. 1007 (1950); United States v. Masonite Corp., 316 U.S. 265, 274, 62 S. Ct. 1070, 86 L.Ed. 1461 (1942); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989 (1927). The Supreme Court has said that any arrangement which in any manner "tampers with price structures" constitutes unlawful price-fixing, Socony-Vacuum, supra, 310 U.S. at 221, 60 S.Ct. 811. See cases collected by Judge Mansfield below, 283 F.Supp. at 882. Never-

chasers of two or more taxicabs could receive a rebate of up to $200 per taxicab from Chrysler. In 1966 and 1967, the plan was altered so as to give rebates to purchasers of single taxicabs and the rebates were set at $183 per vehicle.

2. Though Chrysler's rebate plan is national in character, plaintiff limited its motions to the New York City market because it considered that market to be one of its major markets in the nation and allegedly

the market in which Chrysler's plan caused Checker the greatest business injury.

3. Resolution of the price-fixing issue in a manner favorable to Checker would create another question, which we do not here decide, before a § 1 violation could be made out: whether the rebate plan is a contract, combination or conspiracy within the meaning of § 1.

theless, determining whether a particular scheme should be classified as a price-fixing device has not always been an easy task. Compare the above cases with Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933); Nat'l Ass'n of Window Glass Mfrs. v. United States, 263 U.S. 403, 44 S.Ct. 148, 68 L.Ed. 358 (1923); Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); United States v. Columbia Pictures Corp., 189 F.Supp. 153 (SDNY 1960).

In Susser v. Carvel Corporation, 332 F.2d 505, 510 (2 Cir.), cert. granted, 379 U.S. 885, 85 S.Ct. 158, 13 L.Ed.2d 91 (1964), cert. dismissed as improvidently granted, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965), we held that an ice cream manufacturer's practice of recommending a retail price to its franchised dealers was lawful where "the franchise provisions explicitly reserved to the individual dealer the right to set whatever price he desired" and where no attempts to enforce the price structure were shown. Similarly, in the case at bar, the district court declined to find that Chrysler's rebate plan is unlawful per se under § 1 of the Sherman Act for there is an absence of proof that the plan tends to "affect the exercise of competitive pricing discretion, or to affect or tamper with the range, level, scale, or amount of the price paid for Chrysler taxicabs. * * *." Rather, the court viewed the plan as a mere promotional device, reasoning as follows:

On its face Chrysler's Rebate Plan does not curtail the dealer's pricing discretion. Each dealer is free (1) to raise retail taxicab prices, thus nullifying the effect of the rebate; (2) to keep his prices constant and thus render Chrysler taxicab price competitive vis a vis General Motors, Ford, Checker and other automobile makers who grant similar rebates; or (3) to lower his prices still further in competition against both Chrysler and non-Chrysler dealers alike. No evidence has been offered to the effect that the $183 rebate has even the slightest tendency to restrict in any way the dealer's independent decision and determination as to the retail sales price quoted by him to customers for Chrysler taxicabs. The most that appears from the record before us is that the plan manifests to the taxicab purchaser a desire on Chrysler's part to promote competitive sale of its taxis, at least to the extent of giving the appearance of a price advantage to the customer in the form of a $183 rebate. Possibly the practice acts as a psychological inducement to the customer that cannot be realized through a direct price reduction to the dealer in the identical amount which would, as a practical matter, enable the dealer in his discretion to reduce his price accordingly. Certainly the marketplace is full of similar manufacturer-originated promotional sales "gimmicks," such as "free goods" in the grocery and drug trades, coupons entitling the holder to cash or discounts, and the like, which do not run afoul of the Sherman Act in the absence of a showing of impropriety. The plan does not give as much practical pricing flexibility to the Chrysler dealer as would a direct $183 price reduction in the wholesale price, since the customer, rather than the dealer, is automatically entitled to the rebate upon purchase of a Chrysler taxicab, whereas if Chrysler reduced the price to its dealers by $183, bargaining between each dealer and his customer might ensue to determine how much of the reduction, if any, would be passed along to the retail customer. However, this is an illusory distinction, since the dealer has the freedom to increase his retail price to offset the $183 rebate. 283 F.Supp. at 882–883.

■ Indeed, all of the evidence indicates that the Chrysler dealers are free to sell at their own prices and that the manufacturer's rebate plan is in the nature of an advertising expedient. Contrary to appellant's contentions, the plan lends no assurance to Chrysler that the

entire price cut will be passed on to its dealers' customers. Nor does the availability to Chrysler of an alternative program whereby their dealers would directly receive the price discount and the individual dealers could thereafter decide whether to pass all or part of the price reduction on to their customers prohibit Chrysler's use of the discount device to which appellant objects. All that is required by § 1 for the discount device employed by Chrysler to be valid is that the pricing independence of the individual dealer remain unimpeded. Accordingly, we find the instant scheme falls squarely within our holding in *Susser,* supra.

There remains for discussion the issue of whether Checker might be entitled to a preliminary injunction even though Chrysler's rebate plan is not an illegal price fixing arrangement per se.

The district court's denial of injunctive relief was premised on its findings that there was serious doubt as to whether Checker will ultimately prevail in this action; that a review of the involved hardships and equities did not disclose a balance favoring injunctive relief; and that plaintiff's rights to recover treble damages, if successful, constituted an adequate remedy at law.

■■ An application for a preliminary injunction is most frequently addressed to the judicial discretion of the district court. 7 Moore's Federal Practice, ¶ 65.04, at 1625 (2d ed. 1966). A clear abuse of discretion in such cases, not present in this case, must be shown to an appellate court in order to obtain a reversal of the trial court's denial of temporary injunctive relief. Dino De Laurentiis Cinematografica, S. p. A. v. D–150, Inc., 366 F.2d 373, 374–375 (2 Cir. 1966); Ideal Toy Corp. v. Fab-Lu Ltd., 360 F.2d 1021 (2 Cir. 1966); Moore, supra at 1626.

■ The purpose of a preliminary injunction is to maintain the status quo pending a final determination of the merits, Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 204 (2 Cir. 1966); Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2 Cir. 1953); 7 Moore's Federal Practice, ¶ 65.04, at 1625 (2d ed. 1966). It is an extraordinary remedy, and will not be granted except upon a clear showing of probable success *and* possible irreparable injury. Clairol, Inc. v. Gillette Co., 389 F.2d 264, 265 (2 Cir. 1968); Societe Comptoir De L'Indus. etc. v. Alexander's Department Stores, Inc., 299 F.2d 33, 35, 1 A.L.R.3d 752 (2 Cir. 1962). However, "the burden [of showing probable success] is less where the balance of hardships tips decidedly toward the party requesting the temporary relief." Dino De Laurentiis Cinematografica, S. p. A. v. D–150, Inc., supra, at 375. In such a case, the moving party may obtain a preliminary injunction if he has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation. Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 205 (2 Cir. 1966); Dino De Laurentiis Cinematografica, S. p. A. v. D–150, Inc., supra; Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2 Cir. 1953).

■ Quite clearly, with the per se price-fixing issue resolved against it, the chance of Checker's ultimate success is dim here. It is one thing for the Sherman Act and the Robinson-Patman claims raised by Checker to contain questions ripe for litigation, and quite another thing for those issues to receive a determination favorable to plaintiff upon trial. With respect to the Sherman Act charge, Judge Mansfield's appraisal of the factors a trial court applying the rule of reason is likely to rely upon is a noteworthy appraisal. He considered that Checker's loss of dominion over the 1,600 of the 11,000 taxicab medallions it previously controlled in New York City and the unfriendly relationship between Checker's president, Morris Markin, and the city's fleet owners were more probable causes of Checker's declining sales in New York City than any possible anticompetitive effect created by Chrysler's rebate plan. Moreover, though Chrys-

ler's rebate program is nationwide, only in New York City has Checker experienced a substantial decrease in sales. In addition, despite the continuation by Chrysler of its program, Checker's sales drop has leveled off in recent years. Finally, it is possible that, at trial, inferior design and workmanship, inadequate service facilities, and higher operational costs to taxicab owners may prove to be additional explanations for Checker's competitive difficulties.

The success of Checker's Robinson-Patman claim depends upon the propriety of applying the "indirect purchaser" doctrine[4] and upon a finding that Chrysler taxicabs and passenger cars are of "like grade and quality." The district court's opinion amply demonstrates the improbability that either or both of these requisites will be met. In summary, we are not persuaded of either the likelihood of Checker's eventual success in this litigation or that the issues here raised are of sufficient magnitude and doubt to require the granting of a preliminary injunction.

Checker argues that it will suffer irreparable injury in the form of loss of former customers during the pendency of this action. In Dino De Laurentiis Cinematografica, S. p. A. v. D–150, Inc., supra, we held that the difficulty in computing "damages to reputation, credibility or goodwill" may justify a grant of a preliminary injunction. Our holding there was based upon finding "a sufficient showing of probable success on trial" and "a lack of likelihood of irreparable injury" to the other party if the injunction is granted. 366 F.2d at 376, 377. In the present case, while the losses to Checker through competition with Chrysler may indeed be irreparable, unless Checker can show that Chrysler has engaged in some illegal activity, Checker will not be entitled to recover

compensatory damages or to obtain injunctive relief. The district court was of the belief that Checker will be unable to prove its allegations of Chrysler wrongdoing and refused to grant Checker a temporary injunction. We hold that the court's order was a proper exercise of its discretion.[5]

Affirmed.

4. See American News Co. v. FTC, 300 F. 2d 104, 109 (2 Cir.), cert. denied, 371 U. S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962).

5. We find it unnecessary to decide whether, if Checker had shown a reasonable chance of ultimate success, the availability of treble damages constitutes an adequate remedy at law, and therefore is in itself a sufficient ground upon which to deny the injunctive relief.