**PEARL BREWING CO. et al., Plaintiffs,**

v.

**ANHEUSER–BUSCH, INC., and Jos. Schlitz Brewing Co., Defendants.**

**Civ. A. No. 71–H–778.**

United States District Court,
S. D. Texas,
Houston Division.

Feb. 9, 1972.

David T. Searls, John C. Snodgrass, John L. Murchison, Jr., Max Hendrick, III, Vinson, Elkins, Searls & Smith, Houston, Tex., for plaintiffs.

Raymond A. Cook, Andrews, Kurth, Campbell & Jones, Houston, Tex., Harold F. Baker, Howrey, Simon, Baker & Murchison, Washington, D.C., for defendant Anheuser-Busch, Inc.

Frank J. Knapp, Fletcher Etheridge, Butler, Binion, Rice, Cook & Knapp, Houston, Tex., for defendant Jos. Schlitz Brewing Co.

## MEMORANDUM OPINION AND ORDER

CARL O. BUE, Jr., District Judge.

In this private antitrust action for treble damages and injunctive relief pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, plaintiffs seek preliminary injunctive relief and partial summary judgment. In plaintiffs' original complaint it is alleged that defendants, Anheuser-Busch, Inc. (Anheuser-Busch) and Jos. Schlitz Brewing Company (Schlitz) have (1) engaged with their respective wholesale distributors in price fixing arrangements in violation of section 1 of the Sherman Act, 15 U.S.C. § 1; (2) engaged in an attempt to monopolize the Texas beer industry in violation of section 2 of the Sherman Act, 15 U.S.C. § 2; and (3) engaged in territorial price discrimination in violation of section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a). The conduct of Anheuser-Busch and Schlitz is claimed to have substantially lessened competition in the Texas beer industry. As a result of these activities, plaintiffs seek some $18 million in actual damages and an injunction permanently enjoining Anheuser-Busch and Schlitz from combining with their wholesale distributors to violate the antitrust laws to plaintiffs' injury. For purposes of the present hearing on the preliminary injunction pending a trial on the merits and on the motion for partial summary judgment only the alleged violation of section 1 of the Sherman Act need be considered.

There is no assertion by plaintiffs that Anheuser-Busch and Schlitz combined, conspired or in any other manner acted in concert in any of the alleged violations of the antitrust laws. This Court, accordingly, granted defendants' motion for severance because of misjoinder of parties pursuant to Rule 20, Fed.R.Civ.P. However, since there is a common question of law and fact involved in this action as asserted against Anheuser-Busch and Schlitz, the Court consolidated the actions pursuant to Rule 42(a), Fed.R.Civ.P., for purposes of the hearing on the motion for preliminary injunction.

Pearl Brewing Company (Pearl), is engaged in the business of brewing a regional or popular priced beer in plants in San Antonio, Texas, and St. Joseph, Missouri. Approximately 95 percent of the beer brewed by Pearl is sold in Texas. Pearl sells its beer through 86 independent wholesale distributors in Texas. These distributors sell to retail accounts which are principally supermarkets, grocery stores, package stores, restaurants and taverns.

Defendants Anheuser-Busch and Schlitz are the two largest brewers of beer in the United States. Anheuser-Busch distributes its beer in Texas

through 50 independent wholesale distributors who resell to retailers. Schlitz distributes its beer in Texas through 56 independent wholesale distributors who resell to retailers. The principal contacts which Anheuser-Busch and Schlitz have with the wholesale distributors are through their district managers. Each district manager is assigned to a geographical area within which a number of Anheuser-Busch and Schlitz wholesale distributors are located. It is the responsibility of the district manager to serve as the primary liaison between the brewery and the wholesale distributor. These district managers are intimately familiar with all details of the businesses of the wholesale distributors within their district. All transactions between the brewery and the wholesale distributors are conducted by the district managers. District managers report, and are controlled by, division managers. Division managers are, in turn, responsible to the regional managers, who are directly responsible to the home office management of the breweries.

Anheuser-Busch and Schlitz, in order to promote the sales of their beer, have employed price promotions pursuant to which their wholesale distributors reduce their wholesale price on cases of particular packages of beer to retailers for a specified period of time. These wholesale distributors are contacted and advised of the availability of an allowance per case from the brewery for purposes of conducting price promotions. The wholesale distributors who elect to conduct a price promotion are given an allowance per case sold during the promotion period which is received after the beer is sold to the retailer. The result of these price promotions is that the retailers' shelf prices of Anheuser-Busch and Schlitz premium brand beer during the price promotion period, are equal to or lower than the normal price of Pearl's regional brand beer. Not only do defendants attract new customers to try their brands of beer by employing this business practice, but also retailers tend to give more favorable displays to de-fendants and promote the sales of their beers even during non-price promotion periods.

Plaintiffs contend that in conducting price promotions it is the practice of the defendants to condition price reductions to wholesale distributors on the agreement of the distributor to reduce prices to retailers. It is alleged that these agreements or combinations are, in their essence, price fixing agreements which are per se violative of section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants deny that they have engaged in combinations or entered into price fixing agreements with their wholesale distributors. To counter plaintiffs' assertions, defendants Anheuser-Busch and Schlitz deny entering into such combinations or agreements and assert that (1) competitive conditions in the beer industry require that promotional allowances, or price reductions, be unilaterally given to wholesale distributors who solicit them; (2) the wholesale distributors in every instance freely elect or choose whether or not to reduce their prices to retailers and, if so, they alone decide upon the amount of such reduction; and (3) the wholesale distributors are forced by the intense competition in the marketplace to reduce their prices to retailers. From the various pleadings and briefs filed in this cause there emerges a major premise upon which defendants tenaciously rely, that is, that plaintiffs' assertions can only be viewed in terms of the wholly unilateral conduct of defendants vis-a-vis their respective distributors. As a second defense complementing the first, defendants further stress that since there has been no showing of coercion of such wholesale distributors by the price promotion activities of Anheuser-Busch or Schlitz, there can be no resulting illegal contract, combination or conspiracy. Plaintiffs counter by stating that a showing of the presence of coercion is unnecessary and irrelevant and that the evidence clearly points to the involvement of defendants in a contract or combination in violation of section 1 of the Sherman Act.

*Section 1 of the Sherman Act: Contract, Combination or Conspiracy*

■ Section 1 of the Sherman Act, 15 U.S.C. § 1, which was enacted in 1890, states in part that:

Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

While the purpose of the Sherman Act, and section 1, as aptly expressed in its title, is "to protect trade and commerce against unlawful restraints and monopolies", 26 Stat. 209, the dominant theme of the law is readily apparent—the protection and preservation of competition. The intended implementation of this purpose can be seen by examining the statutory framework of the Act. Section 1 of the Act is aimed at certain "means" to restrain trade or commerce. Accordingly, that section is set in a framework which forbids unduly restraining trade or commerce by means of contracts, combinations and conspiracy. Section 2 of the Act is aimed at the "ends" or results of certain practices, rather than the form of the means employed. It, therefore, outlaws attempts to monopolize and actual monopolization of trade or commerce. See Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

■ In construing the Act, it was early recognized that resort must be had to the common law in order to ascertain the meaning of the terms "contract, combination . . . or conspiracy in restraint of trade" and to determine whether or not particular acts come within the ambit of this section. In re Greene, 52 F. 104 (C.C.S.D.Ohio 1892); see Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). These three terms have acquired somewhat unique meanings under this statute which distinguish them from traditional definitions normally employed in other areas of the law. Thus, while the term "contract" is commonly defined as an agreement, express or implied, based upon a certain consideration, to perform a particular act, these traditional contractual requirements are not to be employed in isolation when making a determination in this statutory context; indeed, the case authorities teach that formal contract principles should not be literally applied to ascertain if the particular conduct in question is within the framework of section 1. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1965); Beverage Distributors, Inc. v. Olympia Brewing Co., 440 F.2d 21, 30 (9th Cir.), cert. denied, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971). The second statutory term, "combination", is normally defined as a union or association of two or more persons for the achieving of a common object. Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679 (1904). However, a combination can also be defined as a unilateral act committed by a first party in dealing with a second party wherein the latter concurs in the former's acts and related policies with knowledge of their intended effect. See Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). The third statutory term, that of "conspiracy", is readily defined as a joint undertaking extending over a period of time with a common purpose, intent or design resulting from a combination or agreement, express or implied, to accomplish an unlawful end or to accomplish a lawful end by an unlawful means.[1] See United States v. Kissel, 218 U.S. 601, 31 S.Ct.

---

1. It has been suggested that a combination and conspiracy are synonymous terms. M. Handler, "Contract, Combination or Conspiracy", An Antitrust Handbook 121 (1958). It has also been suggested that a conspiracy has been distinguished from a contract in that an express agreement need not be shown to establish the former. J. Scott, Antitrust and Trade Regulation Today 1 (1969).

124, 54 L.Ed. 1168 (1910); American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Standard Oil Co. v. Moore, 251 F.2d 188 (9th Cir. 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958).

▮ Despite the somewhat obvious dissimilarities, these three terms are in accord to the extent that all require some consciousness of commitment to a common scheme or to some type of joint action. *See* Dart Drug Corp. v. Parke, Davis & Co., 120 U.S.App.D.C. 79, 344 F.2d 173 (1965). In other words, a proper measure for evaluating conduct in a particular transaction in order to determine if it is to be deemed violative of section 1 is whether or not there is a collaborative element present.

▮ It is clear that an agreement to fix or maintain resale prices is contrary to the policy of freedom of competition underlying the Act and, therefore, unlawful. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). This prohibition applies to implied agreements as well as to formal contracts. United States v. A. Schrader's Son, Inc., 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471 (1920); Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922). Absent such an agreement creating interdependence of decision, a seller's simple refusal to sell to a retailer who will not observe suggested resale prices is not unlawful. The rationale of this exception is the recognition of the right of a seller to freely exercise his own judgment or discretion in order to determine which purchasers, and on what terms, business will be transacted. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). The *Colgate* case is an oft-cited decision involving the vertical relationships as to prices between manufacturer and distributor on which defendants strongly rely to avoid a section 1 violation in this case. The legal principle espoused is not contested by plaintiffs, but its factual relevance is in sharp dispute. However, the law goes on to state that if a seller advances beyond a simple refusal to deal and actually takes affirmative action to secure compliance, such as an announcement to his wholesalers that he will refuse to deal with them if they deal with price-cutting retailers, a combination violative of section 1 is thereby created. United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). Defendants interpret *Parke, Davis,* as pointing up the need to show affirmative action in terms of economic coercion brought by the manufacturer against the distributor in order to violate section 1 of the Act. Plaintiffs, of course, vigorously oppose any such interpretation and rely on the presence of agreement or combination, albeit informal in nature, to establish a statutory violation.

▮ Literally, the Sherman Act would require that a price fixing agreement unreasonably restrain trade, or have a pernicious effect on competition, in order to be violative of its provisions. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). However, the doctrine of per se illegality has evolved in the case law to obviate the necessity for the operation of this so-called rule of reason where the practice in question can have no possible effect other than to unreasonably restrain trade. Few rules under the antitrust laws are more firmly established than the rule that "resale price fixing is a per se violation of the law whether done by agreement or combination." Albrecht v. Herald Co., 390 U.S. 145, 151, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). *See* United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956). The basis for this rule is that "[t]he aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition." United States v. Trenton Potteries Co.,

273 U.S. 392, 397, 47 S.Ct. 377, 71 L.Ed. 700 (1927).

Section 1 of the Act condemns price-fixing, regardless of its form. It has been indicated that "[a]n agreement to pay or charge rigid, uniform prices would be an illegal agreement under the Sherman Act. But so would agreements to raise or lower prices whatever machinery for price-fixing was used." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1940). An agreement to fix the maximum resale price is likewise outlawed because "such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951). These cases would indicate that the test to be employed in determining a violation is whether the agreement, or conduct, interferes with the freedom of sellers or traders in such a manner as to prohibit or restrain their ability to sell in accordance with their own judgment, and not what particular effect the agreement, or conduct, has on the actual prices.

At the time the Sherman Act was enacted its draftors obviously could not foresee the many sophisticated business and economic arrangements in American industry that have emerged in recent years, nor could they anticipate the multiple varieties of innovative devices that have been conjured up by inventive businessmen in an effort to circumvent section 1 of the Act. Accordingly, there is a paucity of reported cases in which clear-cut price fixing agreements are presented for court scrutiny. As a consequence, the courts have been prone to employ a broad view in weighing the presence or absence of price fixing in a given transaction, with the intendments of the Act necessarily being liberally construed and applied to enforce its dictates. Whether or not there is a price fixing agreement in a specific fact situation is actually a mixed question of law and fact. It has been suggested in this Circuit that a two-pronged standard should be employed in making this determination. Such a standard has been articulated as follows:

First, does defendant's conduct constitute price fixing in purpose or effect? Sometimes, as in simple price fixing cases, the answer is easy. Often, however, where the character or effect of the conduct is equivocal, a broader view of the way the market functions is required before a court can decide whether given behavior in fact amounts to price fixing. The second question arises where price fixing is not found, but the practices reviewed may affect price formation. Then its reasonableness or unreasonableness turns on the relative significance of the competition eliminated as compared with their other purposes or effects. A court's task is to determine (1) whether defendants have enough market power to make the restriction on price competition an "undue restraint" and (2) whether they currently exercise the power or intend to do so.

Denison Mattress Factory v. Spring-Air Co., 308 F.2d 403, 411 (5th Cir. 1962) (*quoting* Report of the Attorney General's National Committee to Study the Antitrust Laws 66 (1955)).

The issue as to whether the behavior or conduct of a manufacturer is to be viewed as intentional or consequential in determining if price fixing is present in a particular instance can be discerned in a decision on which both plaintiffs and defendants place heavy emphasis. In Sun Oil Co. v. Federal Trade Commission, 294 F.2d 465 (5th Cir. 1961), rev'd on other grounds, 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963), the Federal Trade Commission held, 55 FTC 955, that defendant Sun Oil Co. (Sun), a gasoline supplier, could not in good faith assert a section 2(b) defense that it was meeting competition when confronted with a charge of price discrimination violative of section 2(a) of the

Robinson-Patman Act,[2] because Sun had entered into a price fixing agreement with McLean, a gasoline retailer. In that case, McLean had "repeatedly asked" Sun to reduce its tank wagon price to him to a level that would permit his gasoline to compete price-wise with Super Test, a competing retailer located across the street. In order to meet the price of Super Test, McLean needed to reduce his price by three cents per gallon. Sun granted McLean a discount of 1.7 cents per gallon, and McLean thereupon reduced his price by three cents per gallon. In reversing the Commission, the Fifth Circuit Court of Appeals did not base its decision, as defendants contend, on the absence of a showing of coercion applied by Sun against McLean. The Court acknowledged that direct proof of an illegal agreement to reduce prices was not necessary, but it concluded that there was insubstantial evidence in the record to support the FTC's finding of a price fixing agreement. The Court indicated that:

> The inference of price-fixing is based, as the examiner phrased it, on McLean's "testimony that he was *required* to take a cut in prices ['and drop his retail price to 25.9'] . . . in order to secure the discount of 1.7 cents per gallon from [petitioner]". The record shows, however, that the arithmetic of the situation, not Sun, required a discount of 1.7 cents and compelled McLean to take a cut of 1.3 cents, if he wished to post a price of 25.9 cents and still keep a bare subsistence margin of 3.5 cents above the tank-wagon price. That is what McLean was trying to say when he talked about being "required" to take a cut and having his margin of profit "reduced". He had no difficulty in making it clear that there was no agreement, no *quid pro quo*, and he saw no inconsistency in his testimony. When Sun finally lowered its tank-wagon price to McLean, it is fair to assume that Sun would not have done so, if McLean had intended maintain-ing his price of 28.9 cents a gallon. Such an arrangement would have given him a margin of 6.5 cents, clearly an unjustifiable preference over other Sun dealers.

> This is a long way from the price-fixing agreement.

294 F.2d 483–84.

Because both plaintiffs and defendants rely heavily on *Sun Oil* in support of their respective positions, it is important to note that the Court in that case found the price allegedly "fixed" was not an artificial one, but, to the contrary, was a price at which McLean could simply compete with his local competitors. An artificial price in the sense that it was not related to the product's supply and demand in the marketplace would have been indicative of price fixing. *See* Cement Manufacturers' Protective Ass'n v. United States, 268 U.S. 588, 45 S.Ct. 592, 69 L.Ed. 1104 (1925); United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); United States v. Chas. Pfizer & Co., 217 F.Supp. 199, 201–202 (S.D.N.Y.1963). It is also significant to note that both the economic intent and the motive of Sun in granting the discount to McLean were closely scrutinized. The Court of Appeals indicated that, if Sun had not been sure that the marketplace would force McLean to lower his price in response to the discount of Sun, the arrangement would have given him "an unjustifiable preference over other Sun dealers." 294 F.2d at 483–84. The Court obviously concluded that Sun gave the discount to McLean because it was aware of the existing competitive factors in the marketplace and cognizant that McLean would be forced to reduce the price to consumers in order to meet this competitive need. Thus, Sun did not intend to give McLean an unjustifiable preference.

An additional observation as to *Sun Oil* should be made in view of its appellate history. The Court of Appeals indicated that it was clear from Mc-

**2.** 15 U.S.C. § 13(a).

Lean's testimony that there was no agreement and "no *quid pro quo*." In light of the case law, this statement should not be misconstrued to mean that traditional contract principles are to be employed as the measure in determining if there is an agreement within the meaning of section 1. As has been pointed out, it is abundantly clear that formal contract requirements occupy no controlling role in the determination of a section 1 price-fixing case. *See* United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); Beverage Distributors, Inc. v. Olympia Brewing Co., 440 F.2d 21, 30 (9th Cir.), cert. denied, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971). On Writ of Certiorari to the United States Supreme Court, the FTC did not seek review of the Circuit Court's holding that there was no price-fixing agreement. 371 U.S. at 511, 83 S.Ct. 358, 9 L.Ed.2d 466. Nevertheless, at the proffer of the suggestion that the retailer might be a "conduit" for the supplier, the Court did indicate that "to the extent that under any such theory the supplier attempted to set, or was responsible for setting, the retail price, there would be inherent antitrust problems arising from possible existence of illegal price-fixing agreements." 371 U.S. at 524, n. 14, 83 S.Ct. at 369.

There are other significant cases which assist in formulating a rule for determining what circumstances existing in the vertical relationship between manufacturer and wholesaler constitute a violation of section 1 of the Sherman Act. In Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969), a rebate plan, under which the purchaser of a taxicab from any authorized Chrysler dealer was entitled to receive an automatic cash rebate, was held not to be a price-fixing agreement violative of section 1. The plan operated without participation by Chrysler dealers. Upon application to Chrysler by the purchaser, the cash discount, a sum not contingent in any respect on the retail purchase price, was paid directly to such buyer by Chrysler. The district court had held that the rebate plan was not unlawful per se under section 1 of the Sherman Act, since there was no proof that the plan "tend[s] to affect the exercise of competitive pricing discretion [to the retail dealers], or to affect or tamper with the range, level, scale, or amount of the price paid for Chrysler taxicabs . . . ." 283 F. Supp. at 883. In affirming the decision of the lower court, the Court of Appeals stated:

> [A]ll of the evidence indicates that the Chrysler dealers are free to sell at their own prices and that the manufacturer's rebate plan is in the nature of an advertising expedient. Contrary to appellant's contentions, the plan lends no assurance to Chrysler that the entire price cut will be passed on to its dealers' customers. Nor does the availability to Chrysler of an alternative program whereby their dealers would directly receive the price discount and the individual dealers could thereafter decide whether to pass all or part of the price reduction on to their customers prohibit Chrysler's use of the discount device to which appellant objects. All that is required by § 1 for the discount device employed by Chrysler to be valid is that the pricing independence of the individual dealer remain unimpeded.

405 F.2d at 323. It is obvious, therefore, that as long as agreements or conduct do not restrict the pricing independence of the competitor or resaler, there is no illegal price fixing "contract, combination . . . or conspiracy." [3]

---

3. In this regard, it has been suggested that acquiescence in a seller's policy as to resale should suffice to establish a vertical agreement between a seller and buyer. Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L. Rev. 655, 705–6 (1962).

In Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), the defendant, a newspaper publisher, attempted to control the resale prices of its independent newspaper carriers who had exclusive territories for the sale of such newspapers. Plaintiff, a carrier, refused to abide by the defendant's suggested resale price, and defendant, through an independent agent, thereupon notified plaintiff's customers that they could receive delivery of the newspaper direct from the defendant at a lower price if they so desired. Some of plaintiff's customers switched to direct delivery by defendant, and the defendant subsequently awarded these customers to another dealer with the understanding that it had to return these customers to the plaintiff if he began to abide by the maximum price ceiling. In holding that there was a combination to fix maximum prices for the resale of defendant's newspapers, which was per se violative of section 1 of the Sherman Act, it was indicated that defendant's

> conduct cannot be deemed wholly unilateral and beyond the reach of § 1 of the Sherman Act. *That section covers combinations in addition to contracts and conspiracies, express or implied.* The Court made this quite clear in United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), where it held that *an illegal combination to fix prices* results if a seller suggests resale prices and *secures compliance by means in addition to* the "mere announcement of his policy and the simple refusal to deal . . . ." Id., at 44, 80 S.Ct. at 512. . . .

The *combination with retailers arose because their acquiescence* in suggested prices *was secured by threats* of termination; the *combination with wholesalers arose because they co-operated* in terminating price-cutting retailers.

390 U.S. at 149, 88 S.Ct. at 871 (emphasis added).[4] It is thus apparent that illegal combinations in vertical situations can arise where there is cooperation or understanding, as reflected from an agreement or common purpose, as well as coercion on the part of the manufacturer.[5] Additionally, the Court rejected the suggestion that there can be no agreement violative of section 1 unless the agreement accrues to the material benefit of all of the parties to the agreement. 390 U.S. at 152, n. 8, 88 S.Ct. 869, 19 L.Ed.2d 998.

It is obvious that the combined thrust of these key decisions is that the reseller or wholesaler must be free to make his own independent pricing determination and that any trespass on his independence is violative of section 1 of the Sherman Act, whether the conduct is characterized as a contract, combination or conspiracy. It follows from such a premise that a practice of conditioning a price reduction on the acquiescence or cooperation of the recipient to reduce its price can only be viewed as imposing restrictions on the reseller's freedom of decision and, as such, is an unlawful price fixing combination. Such a practice, while admittedly less exacting than the provisions of a formal contract, may, nevertheless, employ other means to a sufficiently high degree so that acceptance by the reseller is effected.

---

4. The Court also indicated that, while plaintiff did not allege a combination between defendant and plaintiff's customers, it would not have been a frivolous contention. 390 U.S. at 149, n. 6, 88 S.Ct. at 872, 19 L.Ed.2d 998.

5. It has been suggested that *Albrecht* relied upon the element of coercion in finding a combination among the defendants even though the Court did not expressly so hold. United States v. O. M. Scott

& Sons Co., 303 F.Supp. 141, 153 (D.D.C. 1969). But then it can also be urged that a contract or agreement, apart from a combination, is the ultimate in coercion. *See* Transcript, at 1447–49; Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655, 692 (1962); *see also* Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

### Defendants' Price Promotions

Having extracted a legal test from the authorities, the determination of the presence or absence of the wholesaler's pricing independence when dealing with the manufacturer, the next inquiry is whether the actions of these defendants have restricted such independence in any way. The contentions of plaintiffs are that each defendant has combined vertically with its own wholesale distributors to reduce prices to retailers and that the overwhelming proof in the case belies the existence of the professed pricing independence of such Anheuser-Busch and Schlitz distributors. The defendants, of course, deny that their activities fall within the framework of the Sherman Act. From an examination of the plethora of several thousand documents introduced into evidence as well as other proof including testimony from witnesses at the hearing on preliminary injunction, this Court has been able to analyze in considerable detail the business procedures followed by Anheuser-Busch and Schlitz.

### A. Anheuser-Busch

As to Anheuser-Busch, its wholesale distributors are generally advised by the brewery of the availability of price promotion allowances, and they, in turn, indicate to the brewery whether or not they desire to promote during a particular period. Wholesale distributors who accept the promotion are, in effect, advising the brewery that they will reduce their prices to retailers.[6] There is an understanding between the brewery and the wholesale distributors that if the wholesale distributors do not promote, or reduce their prices, they are not entitled to the price discount.[7] Consequently, an allowance, or price discount, is not granted to wholesale distributors unless they agree to promote in advance of the promotion period.[8] Similarly, if the wholesale distributor does not, in fact, promote or reduce his prices to retailers during the promotion period, he does not receive the allowance or discount.[9] The allowance or discount to the wholesale distributor is made only at the termination of the promotion period.[10] Wholesale distributors who accept an allowance or discount from the brewery invariably participate financially by reducing the prices to retailers in an amount which exceeds the discount received from the brewery.[11]

Certain additional observations pertaining to the Anheuser-Busch operations deserve mention and are amply supported by the documentary evidence. First, the wholesale distributors and the brewery are in constant contact with regard to the price promotions: "Each price promotion will be reviewed with each subscribing wholesaler to maximize account coverage with material and product plus objective attainment."[12] Second, Anheuser-Busch views price promotions as a mere tool for market penetration to secure additional sales, and not as a method to meet competition in the "marketplace."[13]

In addition to the evidence pointing to the presence of an agreement or understanding to reduce prices, there is also evidence suggesting that the exact re-

---

6. Transcript, at 941, 978, 1043, 1066; Deposition of William F. Lange, at 11–12; Deposition of Leslie H. Dixon, at 111.

7. Deposition of William F. Lange, at 115.

8. Anheuser-Busch Exhibit No. 287; Deposition of Leslie H. Dixon, at 114.

9. Anheuser-Busch Exhibit No. 322; Deposition of J. Dan Brown, at 18–19; Deposition of Jack P. Gray, at 118–19; Deposition of William J. Crain, at 51. See Transcript, at 1457.

10. Anheuser-Busch Exhibit No. 711.

11. See Anheuser-Busch's Answer to Plaintiffs' Interrogatory No. 19; Anheuser-Busch Exhibit Nos. 1621–26 and 3001–03; see also Transcript, at 1066.

12. Anheuser-Busch Exhibit Nos. 1556 (project study by Anheuser-Busch's Houston district manager), 1558, 1563, 1621, 3579.

13. See Anheuser-Busch Exhibit Nos. 1556, 4066. See also Deposition of William F. Lange, 83–85; Deposition of Jack P. Gray, at 99; Deposition of William J. Crain, at 46–47.

sale price to retailers was in many instances pre-determined. The planning and initiation of the price promotion generally occur at the division manager levels. The division manager's "Action Plans" reflect that a determination was made, not only of the amount of the discount to the wholesale distributors, but also of the total price reduction to be made to retailers.[14] The promotion recommendation reports submitted by the division manager to the brewery provide for the total price reduction to retailers, including the common notation "Split 25 cents Anheuser-Busch, 25 cents wholesaler."[15] The "Allowance Authorization" reports from the brewery to district managers indicate the intended resale price to retailers.[16] These reports typically indicate: (1) each market in which a promotion is to be conducted; (2) an estimate of normal sales in that market on the package involved in the promotion; (3) an estimate of the percentage increase expected to result from the promotion; (4) the promotion allowance to be paid after the promotion to each wholesale distributor; (5) the current gross profit of each wholesale distributor (without price promotions); and (6) the promotion gross profit to each wholesale distributor. Additionally, the current price to the retailer charged by the wholesale distributor and the anticipated promotion price to the retailer are listed. The testimony of the individual wholesale distributors support the existence of a pre-determination of the exact resale prices.[17]

Reports submitted by district managers to Anheuser-Busch also suggest a pre-determination of the resale price to consumers.[18] Wholesale distributors commonly propose certain retailers' resale prices to the brewery.[19] The division manager notifies the district manager involved of the brewery's approval of the proposed price promotion. The district manager then notifies the wholesale distributors of this approval "to give them as much lead time as possible."[20] The division manager also notifies the "off premise sales" representative who, in turn, is "to coordinate this promotion with the involved wholesalers so that the maximum efforts can be obtained. This naturally would include coordination of chain store commitments . . . ."[21] This brewery representative then contacts major chain stores for commitments and notifies the individual wholesale distributors of the responses of the chain stores.[22]

### B. Schlitz

Turning now to the Schlitz operations, the facts pointing to a combination between Schlitz and its wholesale distributors to reduce prices to retailers are similar. Schlitz generally notifies its distributors of the availability of price promotions, and distributors "elect" whether or not to participate.[23] The amount of the "split" or the reduction in price to be absorbed by the brewery and wholesale distributor is commonly agreed upon prior to the promotion period.[24] The wholesale distributor only receives the allowance or discount after he reduces his prices to retailers.[25]

14. Anheuser-Busch Exhibit Nos. 4041, 4070.

15. Anheuser-Busch Exhibit Nos. 3001–03.

16. Anheuser-Busch Exhibit Nos. 1–500.

17. Transcript, at 1047–50, 1063–64, 1066, 1261–63.

18. Anheuser-Busch Exhibit No. 1560.

19. Anheuser-Busch Exhibit Nos. 958, 3667, 3668.

20. Anheuser-Busch Exhibit No. 3579.

21. Anheuser-Busch Exhibit No. 1759.

22. Anheuser-Busch Exhibit Nos. 3570, 3573–74, 3577.

23. Deposition of James F. Lawrie, at 73–74.

24. Transcript, at 1143, 1166; Schlitz Exhibit Nos. 312, 322, 328, 565, 619, 668, 669, 728, 730.

25. Deposition of James F. Lawrie, at 30; Deposition of Carl Shirley, at 79; Deposition of William Nichols, at 65; Deposition of G. Robert Bibers, at 40; Deposition of George S. Gideon, Jr., at 37, 87–88; Schlitz Exhibit No. 344.

Schlitz views price promotions as a method to penetrate the market, to secure additional sales, and not as a method to meet competition.[26]

With regard to agreements to set the specific resale price to retailers, the evidence pertaining to Schlitz differs materially from that related to Anheuser-Busch. Before price promotions are conducted by the wholesale distributor, the Schlitz district manager submits to the division manager a "promotion request" form. This form typically indicates: (1) the beer involved; (2) the specific promotion time period; (3) the amount of brewery allowance or discount; (4) the reduction by the wholesale distributor; (5) the current price to retailers; and (6) the expected price to retailers. An evaluation form, which prior to 1970 accompanied the request form but since 1970 is an actual part of that form, also indicates: (1) the actual price charged by the wholesale distributor; and (2) the actual price charged by the retailer. The price charged by the wholesale distributor which is listed on the evaluation form invariably coincides with the anticipated wholesale distributor price listed on the request form.[27]

District managers often communicate with division managers about the wholesale distributor's price to retailers.[28] To receive an allowance or discount, the wholesale distributor is required to sell at the pre-determined price.[29] Accordingly, the wholesale distributors commonly sell to retailers at the precise price reflected on the promotion request form.[30] There is also evidence that Schlitz' district managers regularly contact retail chain stores in an attempt to secure special pricing to consumers during price promotion periods.[31]

## C. Conclusions

It is apparent from the voluminous records and testimony that the pricing independence of the Anheuser-Busch and Schlitz wholesale distributors has been tampered with and consequently restricted. It is also apparent that the respective price promotions conducted by Anheuser-Busch and Schlitz are extremely well-planned sales promotion programs which are created and conducted for the purpose of securing an increasingly larger share of the Texas beer market. Thus, the economic intentions and motives of Anheuser-Busch and Schlitz are properly considered in such a light and not merely as efforts aimed at meeting existing competition in the marketplace. It is even more apparent after scrutiny of the many brewery price promotion forms which were submitted at the hearing that Anheuser-Busch and Schlitz view price promotions primarily in terms of the price at which the beer is to be sold to retailers. Additionally, the resulting prices to wholesale distributors and to retailers, all of which are contained in the price promotion forms, possess no consistent relationship to the supply and demand in the marketplace.

### Plaintiffs' Prayer For Preliminary Injunction

The purpose of preliminary injunctive relief is to maintain the status

---

26. See Appendix to Plaintiffs' Post Trial Brief which reflects through use of Schlitz price promotion forms assessing thirty-eight geographical marketing locales in Texas the promotion periods, the wholesale distributor's contribution to the promotion which is always matched by Schlitz and the success evaluation of the promotion. See also Deposition of Carl Shirley, at 47–50; Deposition of George S. Gideon, Jr. at 77.

27. See Schlitz Exhibit Nos. 853, 1207, 1217, 1354–65, 1369–79, 1383, 3931–33.

28. See Schlitz Exhibit Nos. 58, 565, 669, 728.

29. Deposition of James F. Lawrie, at 38–39.

30. Transcript, at 1142–44, 1166, 1181–82, 1185; Deposition of Patrick H. McKenna, at 58; Deposition of Marvin A. Elder, at 40–41; Deposition of Hal Hillman, at 9–9A, 40–41, 50–51; Deposition of G. Robert Bibers, at 29, 32–34; Deposition of William Nichols, at 33, 36–37.

31. Schlitz Exhibit Nos. 155, 868, 1081; Deposition of Carl Shirley, at 59–60, 62–63, 84–86.

quo pending a final determination of the merits.[32] Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738 (2d Cir. 1953). A motion for an interlocutory injunction is addressed to the judicial discretion of the trial court. Rice & Adams Corp. v. Lathrop, 278 U.S. 509, 49 S.Ct. 220, 73 L.Ed. 480 (1929). In order to obtain this extraordinary remedy the plaintiffs must prove that there is a reasonable probability that they will ultimately prevail on the merits and that there is an immediate danger of irreparable damage or injury. Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). If a showing is made that the balance of hardships clearly favors the plaintiffs, then it need only be shown that "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair grounds for litigation and thus for more deliberate investigation" have been established. Hamilton Watch Co. v. Benrus Watch Co., *supra*, 206 F.2d at 740. However, a caveat has been acknowledged in this Circuit to the effect that:

> We recognize the salutary principle that where the facts are sharply in dispute on preliminary hearing, the trial court should go extremely slow in entering an order that, by its very nature, may seriously interfere with the course of competition.

General Gas Corp. v. National Utilities of Gainesville, Inc., 271 F.2d 820, 822 (5th Cir. 1959).

This Court concludes from the law and the evidence that plaintiffs have demonstrated there is a reasonable probability of ultimate success on the merits. Nevertheless, after a detailed and thorough review of the entire record, the Court is not convinced that plaintiffs will suffer irreparable and immediate injury if the status quo is not maintained pending the trial on the merits.[33] It is alleged that plaintiffs will suffer two types of harm in the absence of preliminary injunctive relief. First, it is urged that all of the plaintiffs will suffer a loss of goodwill as a consequence of the piracy by defendants of loyal Pearl beer drinkers through such price promotion practices; it is then contended that once such a decision is made to switch from Pearl to Anheuser-Busch and Schlitz, the resulting loss to Pearl prior to a trial on the merits can only be partially compensated for in money damages. Second, it is contended that the business of Joe Huggins Pearl Beer Distributing Co. in Houston, Texas and Walter Slate's wholesale distributorship in Big Spring, Texas will, in all probability, collapse prior to the trial. Although plaintiffs have demonstrated in all reasonable probability that some loss of sales will occur because of the illegal conduct of defendants, this Court has difficulty in ascertaining the extent of seriousness of this loss.

As to the first contention, the alleged loss of statewide goodwill, this difficulty arises from a recognition that (1) plaintiffs have suffered a serious decline in sales in the so-called non-promotional beer markets in which there are no brewery supported price promotions and (2) plaintiffs have acknowledged that they have been faced with many management and marketing problems for the past several years.[34] Any losses of sales and

---

**32.** Section 16 of the Clayton Act, 15 U.S.C. § 26, states that the traditional principles of equity shall control in private actions for injunctive relief for alleged violations of the antitrust laws. In other words, there is nothing exceptional added, by reason of the presence of the antitrust elements, in the determination of whether or not an interlocutory injunction should be issued. *See* Kay Instrument Sales Co. v. Haldex Aktiebolag, 296 F.Supp. 578 (S.D.N.Y.1968).

**33.** Prior to the hearing on the motion for preliminary injunction defendants voluntarily ceased their price promotion activities. However, defendants have indicated that this is only a temporary halt and that the promotions may be re-employed at any time.

**34.** *See* Transcript, at 81; Pearl Exhibit No. 2484.

goodwill by Pearl resulting from the defendants' price promotions have been accelerated by several factors. First, the diminution in the price spread between the regional-priced beer of Pearl and the premium-priced beers of Anheuser-Busch and Schlitz has contributed to a decrease in plaintiffs' sales.[35] Second, the lack of stability in the management force of Pearl has been an important factor.[36] Third, the marketing mistakes of Pearl are of considerable magnitude.[37] Fourth, and finally, the unsatisfactory performance in beer taste tests has played a significant role in Pearl's present position.[38] Pearl's allegation of loss of goodwill is insufficient to justify preliminary injunctive relief in view of these various factors affecting its business posture during the years in question. Furthermore, plaintiffs' opportunity to recover treble damages under the Act at a trial on the merits affords ample relief under the circumstances of this case.

As to the second contention, the two individual wholesale distributors have, likewise, failed to establish immediate or potential irreparable injury. The primary difficulty facing the Huggins distributorship is its cash obligations pursuant to a mortgage purchase contract. The business was "purchased" by means of borrowed funds with too little actual investment by its youthful owner, Joe Huggins, with the result that the yearly income of the business has been and is severely drained to meet mortgage payments. Further, this Court does not. feel that there is a reasonable probability that this distributorship will actually collapse prior to the trial on the merits.[39] The problems facing the Slate distributorship are of a similar, if not identical, nature. The obligation of Walter Slate in the form of a yearly note is disproportionately large for the amount of business normally conducted by the distributorship. Further, this Court is not convinced by the evidence that there is a reasonable probability that his business will collapse prior to a trial on the merits.

The purpose in enumerating these unfavorable conditions and occurrences with regard to Pearl's past business performance is not to infer that a significant economic injury cannot be established at the trial on the merits; rather it is to point out that because of these factors, in conjunction with the opportunity to recover treble damages at the trial, plaintiffs have not satisfied the heavy burden of persuasion required for the obtaining of preliminary injunctive relief in this case.

As a result of the present disposition of plaintiffs' motion for preliminary injunction, it is unnecessary to consider and pass upon defendants' additional contentions that equitable relief is precluded because of the alleged unreasonable delay in filing and prosecuting this lawsuit, that plaintiffs possess unclean hands in conducting similar price promotions on behalf of Pearl in the Texas market, and that an overriding public interest exists in favor of lower price concessions on beer to consumers.

*Plaintiffs' Prayer For Partial Summary Judgment*

Plaintiffs next assert that they are entitled to a partial summary judgment determining as a matter of law

---

35. *See* Transcript, at 344–45; Anheuser-Busch (Wilkinson) Exhibit No. 1, at 20–32.

36. Pearl Exhibit No. 2670.

37. Transcript, at 193, 179, 180, 370–71, 766; Deposition of Albert J. Range, at 147.

38. Pearl Exhibit No. 2181.

39. *See* Transcript, at 526.

that each defendant has violated section 1 of the Sherman Act and that, as a result thereof, each plaintiff has been injured in his business or property. A summary judgment is appropriate and permissible where depositions, answers to interrogatories and affidavits disclose that there is no triable issue of fact and that a judgment should be entered as a matter of law. Dale Hilton, Inc. v. Triangle Publications, Inc., 27 F.R.D. 468 (S.D.N.Y.1961). However, it is also a well established principle that:

> [S]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot

Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Similarly, summary procedures are condemned where the parties have not had an opportunity to search out the truth and present the facts adequately. Loew's Inc. v. Bays, 209 F.2d 610 (5th Cir. 1954). After a thorough scrutiny of the voluminous affidavits, depositions, answers to interrogatories, exhibits and the record of the protracted hearing on motion for preliminary injunction, taking into account as well the stringent time limitations surrounding the hearing and the multitude of facts and issues abounding in this lawsuit, this Court does not feel that plaintiffs have clearly demonstrated that there is no genuine issue of fact yet to be tried. *See* Broussard v. Socony Mobil Oil Co., 350 F.2d 346 (5th Cir. 1965); Chapman v. Hawthorne Flying Service, 287 F.2d 539 (5th Cir. 1961).

Accordingly, although plaintiffs have demonstrated that there is a reasonable probability of their being ultimately successful at a trial on the merits, their motions for preliminary injunctive relief and partial summary judgment are hereby denied. It is so ordered. The clerk will notify counsel.