**FREED OIL COMPANY, INC., et al., Plaintiffs,**

**v.**

**QUAKER STATE OIL REFINING CORPORATION and the American Oil Company, Defendants.**

**Civ. A. No. 26–71 Erie**

United States District Court, W. D. Pennsylvania.

Aug. 11, 1976.

As Corrected Sept. 16, 1976.

Robert Levy and Berryl A. Speert, Baltimore, Md., Robert J. Kelleher, Erie, Pa., for Freed Oil Co.

Carl L. Dubin, Milwaukee, Wis., for American Fuel & Supply Co.

Foley, Hoag & Eliot, Boston, Mass., for plaintiffs.

Irving Murphy, Erie, Pa., for defendant American Oil Co.

William J. McFate, Oil City, Pa., Allan Van Gestel, Robert D. Paul, Boston, Mass., for Quaker State Oil & Refining.

Samuel Haubold and Fred H. Bartlit, Jr., Chicago, Ill., for American Oil Co.

## OPINION

WEBER, District Judge.

This is a civil antitrust action in which a non-jury trial has been held on issues of liability.

Plaintiff Freed Oil Company, Inc. (Freed Oil), a Massachusetts corporation with its principal place of business in Millis, Massachusetts, is a small, closely held corporation engaged in the wholesale distribution of motor oil products to mass merchandisers and discount houses. Freed Oil has never had any contract with either of the defendants herein for the distribution of Quaker State Oil Refining Corporation (Quaker State) products, but has instead relied on other sources of supply.

Plaintiff American Fuel and Supply Company, Inc. (AFSCO) a Wisconsin corporation with its place of business in Milwaukee, Wisconsin, is a closely held firm which has sold Quaker State products on the wholesale level to discount houses, mass merchandisers, other wholesale distributors and, to a lesser extent statute stations and small retail outlets. AFSCO began purchasing Quaker State products from Quaker State distributors in the early 1960's and in late 1964 itself became a subdistributor of Quaker State Products in the midwestern United States. AFSCO acquired subdistributor status by executing a contract with defendant the American Oil Company (American Oil), the largest of Quaker State's independent distributors. AFSCO continued its contractual relationship with American Oil until in September, 1969, American Oil terminated the agreement, alleging infringement of the "American" trademark and misbranding of Quaker State products.

Plaintiff Rivers Bros. Inc. (Rivers Bros.), a Massachusetts corporation located in Fitchburg, Massachusetts, a closely held firm, is an American Oil jobber selling American Oil gasoline and other "American" brand products as well as Quaker State motor oils. Rivers Bros.'s chief wholesale customer for Quaker State products has been plaintiff Freed Oil.

Defendant Quaker State is a Delaware corporation with its principal place of business in Oil City, Pennsylvania. Quaker State is engaged in the refining and marketing of automobile lubricants, principally motor oils, and also manufactures and markets gasoline, distillate fuels and other petroleum products, although on a smaller scale. Quaker State competes in the marketing of its product with the major integrated oil companies, but, unlike the major oil companies, it has no nationwide distribution network of "Quaker State's service stations. Quaker State instead relies on a diversified group of approximately 250 independent distributors located throughout the nation, who resell Quaker State products to service stations, car dealers, repair shops, jobbers, mass merchandisers, discount houses, and other retail outlets.

The largest of Quaker State's independent distributors is defendant American Oil, a Maryland corporation, with its principal place of business in Chicago, Illinois. American Oil has for many years been Quaker State's chief distributor in the midwestern United States. American Oil in turn distributes Quaker State's products in the midwest through its own "Standard" brand service stations and through independent subdistributors with which it has contracts.

In Count I of the Complaint, Plaintiffs Freed Oil and AFSCO bring an action under Section 1 of the Sherman Act, 15 U.S.C. § 1, to obtain damages and equitable relief against defendants Quaker State and American Oil. Count II of the Complaint was instituted by plaintiff Rivers Bros. against Quaker State only and is also brought under Section 1 of the Sherman Act for damages and equitable relief. The Complaint alleges that Quaker State and American Oil and various coconspirators, including Quaker State, distributors and American Oil jobbers, have been and are presently engaged in an unlawful conspiracy to maintain the retail price of Quaker State motor oils at artificially high levels in violation of Section 1 of the Sherman Act.

In furtherance of this conspiracy defendants are alleged to have imposed upon distributors and jobbers various restraints designed to preclude intra-brand price competition in the sale of Quaker State products.

The alleged restraints include (1) preventing distributors and jobbers from selling Quaker State motor oil to discount

stores, except upon limited conditions established by Quaker State, (2) preventing distributors and jobbers from selling Quaker State motor oil to customers located beyond their assigned geographic territories, (3) preventing distributors and jobbers from selling Quaker State motor oil to other distributors or motor oil brokers who regularly sell motor oils to discount stores or customers located throughout wide geographic areas, (4) preventing Quaker State distributors from selling Quaker State motor oils to accounts served by American Oil or by American Oil jobbers, and (5) preventing American Oil jobbers from selling Quaker State motor oils to other than branded American Oil service stations.

Both defendants have asserted counterclaims, American Oil asserts a counterclaim against AFSCO, alleging that in violation of an injunctive order of the United States District Court for the Northern District of Illinois, AFSCO has used the trade name "American" on AFSCO's store-front, trucks, order forms and on a private brand of windshield washer solvent.

Quaker State also counterclaims against AFSCO, alleging that AFSCO has sold to AFSCO's customers motor oils, automotive undercoating products and related petroleum based products not manufactured, distributed or sold by Quaker State but packaged in containers bearing Quaker State's trademarks and name, and that some of these sales were made on purchase orders specifically calling for Quaker State products at Quaker State prices. This counterclaim is asserted in three counts. Count 1 is for trademark infringement; Count II is for federal unfair competition, and Count III is for common law unfair competition. AFSCO's answer to Quaker State's counterclaim is that the practices complained of, even if unauthorized, were minimal and motivated solely by the urgent need of AFSCO to keep certain prime customers whom AFSCO was unable to supply because of Quaker State's illegal refusal to sell it sufficient quantities of Quaker State products.

The court first finds that it has jurisdiction over plaintiffs' claims under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and ancillary jurisdiction over the Defendants' counterclaims against AFSCO. Section 35 of the Lanham Trade-Mark Act, 15 U.S.C. § 1117, also provides jurisdiction over the counterclaims.

Quaker State motor oils are refined from Penn grade crude oil. Penn grade crude oil is unusual in that it yields a very high proportion of lubricating oil stocks and requires fewer additives than other crude oils to meet certain minimum standards established by the American Petroleum Institute, the Society of Automotive Engineers, and other organizations which test motor oils. For a number of years Quaker State has expended considerable sums of money advertising Quaker State motor oils. As a result the Quaker State brand has become well known, and Quaker State motor oils have generally commanded premium prices.

Since the early 1960's and continuing until early 1972, adequate quantities of Penn grade crude oil were readily available to meet Quaker State's refining requirements. However, insufficient production facilities at the Quaker State refineries have at various times made it impossible for Quaker State to fill promptly all of the orders for motor oils forwarded by its distributors. Beginning around 1964 two factors combined to produce a shortage of Quaker State motor oils. First, there occurred an extraordinary growth in the demand for motor oils and other lubricating products with the Quaker State brand. Between 1964 and 1971 the volume of Quaker State sales increased at a rate of about thirteen times that of the lubricant industry as a whole. Second, during the same period, there occurred a constantly increasing demand for lighter weight and multi-grade oils. "Neutral" (neutral base blending oil), one of the two base oils obtained from Penn grade crude and one of the basic constituents of refined motor oils, is required in much greater percentages in the light and multi-grade motor oils than it is in heavier and single grades. However, there can be refined from a given quantity of Penn

grade crude only about 16% by volume of neutral.

Quaker State began to make attempts to increase its output of motor oil to meet distributors' demands. These steps included increasing to the limit the through-put capacity of each of Quaker State's three existing refineries. Nevertheless, even as Quaker State was operating its three refineries at 90 to over 100% of capacity during this period, it found necessary the purchase of neutral in substantial quantities from other Penn grade crude oil refineries. During 1968 Quaker State initiated a study of the feasibility of constructing a new refinery. The study resulted in the construction of a new refinery at Congo, West Virginia, and an increase in total refining capacity of almost 70% at a cost in excess of the then net worth of Quaker State. Refined product shortage continued, however, until the new facility was in full operation.

## HISTORY OF THE RELATIONSHIP BETWEEN QUAKER STATE AND AMERICAN OIL

Standard Oil Company of Indiana (Standard Oil), the predecessor in interest of American Oil, became a distributor of Quaker State motor oils in 1937 and was then assigned a territory consisting of fourteen midwestern states and portions of four other midwestern states (Midwest Region). The 1937 agreement between Standard Oil and Quaker State provided that Standard Oil would have the exclusive right to distribute Quaker State motor oils to customers throughout the Midwest Region with the exception of certain customers reserved by Quaker State for itself. The agreement provided that Standard Oil was not to solicit or make sales outside of its assigned territory. Standard Oil agreed not to sell or distribute in its assigned territory any motor oil refined from Penn grade crude oil other than Quaker State, and further agreed to conform to and maintain Quaker State's national policy including suggested resale prices and trade discounts.

In 1942 another agreement containing substantially the same terms as the 1937 agreement was executed by the same parties. The 1942 agreement remained in effect until 1952 when the parties executed an agreement referring to the same general geographic territory but deleting all references to the division of customers and to resale price maintenance. It is clear from the evidence that while the 1952 agreement was in effect Quaker State made no direct sales to Standard Oil customers in the Midwest Region and appointed no distributors other than Standard Oil in the Midwest Region.

Prior to 1966 Quaker State distributors who sold in the Midwest Region were warned by Quaker State and American Oil to stop this practice.

The "Midwest Agreement" between Quaker State and American Oil continued, subject to various renewals, until on August 1, 1966, a new "Midwest Agreement" was executed. This agreement provided that American Oil would be the sole distributor of Quaker State products in sixteen midwestern states and portions of four other states. This new "Midwest Agreement" provided that American Oil would, in addition to promoting the sale of Quaker State products at its own service stations, solicit sales from all prospects within the territory, including subdistributors and dealers who did not handle other products distributed by American Oil.

In 1961 Quaker State and American Oil entered into an agreement which granted American Oil the rights to sell Quaker State products in 25 eastern and southern states and the District of Columbia (East and South Region). Because Quaker State motor oils were then distributed in the East and South Region through independent Quaker State distributors and by Quaker State directly to Quaker State service stations, the agreement provided that American Oil would promote the sale of Quaker State products at retail only through its "American" brand service stations.

American Oil subdistributors who sold to customers other than branded American service stations in the south and east prior

to 1966 were warned by Quaker State and American to stop this practice.

On November 16, 1966, the parties entered another "East and South Agreement" under which the designated territory was expanded to include some states in the western portion of the country. This 1966 agreement eliminated the requirement that American Oil sell Quaker State products at retail only through its own service stations. This change was the result of a January 1966 civil investigative demand served on Quaker State by the United States Department of Justice and the advice of counsel for Quaker State in light of the investigative demand. The Department of Justice investigation led to the filing of a civil action, *United States v. Quaker State Oil Refining Corporation,* Civil Action No. 56–69 Erie (Western District of Pennsylvania), which culminated in the entry of a consent decree on July 24, 1969. Less than one month after the entry of the consent decree, the provision in the "Mideast Agreement" which granted American Oil an exclusive distributorship, was deleted. No evidence has been presented, however, that since that change in the agreement other distributors have been appointed in the Midwest Region or that Quaker State has itself competed with American Oil.

## AMERICAN OIL SUBDISTRIBUTOR CONTRACTS

Pursuant to its agreement with Quaker State, American Oil promoted the sale of Quaker State motor oils in the Midwest Region, both at its branded service stations and through independent jobbers who resold to various classes of customers. During the period 1948 to 1954 American Oil required its jobbers to execute printed contract forms which assigned specific territories to these jobbers and precluded the jobbers from making sales outside of their assigned territories. These contracts also contained clauses which precluded the jobbers from making sales to service stations supplied by American Oil or directly to consumers. The jobbers were also precluded from selling to accounts reserved by Quaker State for itself.

During 1965 and 1966 American Oil required its jobbers who purchased Quaker State products in the Midwest Region to execute printed contract forms. These forms assigned to each jobber a specific territory and further provided that each jobber should not sell such products beyond the limits of his own territory nor knowingly sell such products to others for delivery beyond the limits of his territory without American Oil's consent. The contracts containing these provisions remained in effect until 1967.

Pursuant to its "East and South Agreement" with Quaker State, American Oil promoted the sale of Quaker State motor oils at its branded service stations by entering into distributor contracts with its jobbers who branded American Oil products. During 1965 and 1966 American Oil required its jobbers who purchased Quaker State Motor oils to execute printed contract forms which prohibited the jobbers from selling Quaker State motor oils to non-American service station accounts or accounts outside of assigned territories. These provisions remained in the contracts with jobbers until 1967 and at least one contract with such provisions was executed in 1971.

## QUAKER STATE DISTRIBUTOR CONTRACTS

Prior to 1967 Quaker State entered into distributor agreements with its independent distributors on printed forms which contained clauses restricting the distributors' sales to assigned territories. These contracts were cancellable by Quaker State for any reason on sixty days notice. Quaker State entered into distributor agreements with various gasoline distributors which operate retail gasoline stations in the eastern and southern portions of the country. The agreements with these distributors restricted the distributors' sales of Quaker State motor oils to service stations which were owned, operated, or controlled by these distributors. These agreements typically included a typewritten insertion describing the territory assigned to the distributor.

Certain of the agreements provided that a distributor could sell Quaker State motor oils to specified consumer accounts outside the assigned territory but that the distributor would then be required to pay a commission on each outside sale to the Quaker State distributor in whose territory such sale was made.

Beginning in December 1966, Quaker State deleted the territorial and customer restrictions and the sixty day cancellation clauses from its printed form of distributor agreement and began to use new contract forms. The new forms were operative for one year periods and contained clauses establishing the maximum number of gallons of motor oil which Quaker State obligated itself to sell to the distributor during the contract term. There is some correlation between the maximum gallonage allotted to a given distributor and that distributor's number of approved customers within his assigned territory. For example, Corn Bros., a Quaker State distributor in Atlanta, Georgia, was assigned additional territory by Quaker State in 1968, and the maximum gallonage provision in Corn Bros. contract was increased in approximate proportion to the increase in approved customer requirements.

In September 1969, Quaker State executed letter agreements with its distributors deleting the maximum gallonage provisions from the contracts. Soon thereafter Quaker State began to execute new distributor agreements without any maximum gallonage provisions.

## DISCOUNT STORES

In the early 1960's discount stores began to proliferate throughout the country. Discount store operators discovered that certain well advertised premium products, such as motor oils in general and Quaker State motor oils in particular, could be used as leaders. These products could be promoted and advertised at prices close to their cost to draw large numbers of customers into the stores. Service station dealers began complaining to their Quaker State distributors and directly to Quaker State and American Oil that sales of Quaker State motor oils at service stations were suffering as a result of competition from the discount stores. Quaker State and American Oil recognized the problem and made assurances to their distributors and jobbers that attempts would be made to eliminate the supply of Quaker State motor oils reaching discount stores.

However, by the mid-1960's the near impossibility of completely stopping the sale of Quaker State motor oils had become apparent to Quaker State and American Oil. Quaker State, therefore, began to allow its distributors to sell within their respective territories to those discount stores which had previously obtained Quaker State motor oils from outside sources. Internal memoranda [1] between Quaker State managers indicate that such approved sales to discount stores should nonetheless be limited in quantity and be made only with the understanding that the retailer not advertise Quaker State products at a cut price. In September of 1968, this procedure of dealing with discount stores was formalized under Quaker State's National Accounts Program.

Under the National Accounts Program, discount stores which had been successful in obtaining significant quantities of Quaker State motor oils from motor oil peddlers, Quaker State distributors or American Oil jobbers were accepted as National Accounts. Quaker State did not, however, actively seek to sell its products to discount

---

1. Quaker State's Post-Trial Brief devotes a great deal of argument to the grounds urged at trial for denying admission of these and other documents. The point most strongly argued was that the bulk of the most incriminating of these documents were authorized by middle or lower level management personnel who lacked the authority to bind the corporation by admissions and who were not called to authenticate the documents at trial. At p. 674 of the trial transcript the court, after receiving extensive trial briefs on these arguments, ruled the documents admissible subject to a later motion to strike. A review of the later testimony and of the briefs had convinced the court that these documents were properly admitted and the motion to strike which may be found in these briefs is, therefore, denied.

stores which had not previously carried its products. These accounts were serviced by Quaker State distributors who, after paying for and taking title to the product, delivered it from their own inventories to the discount stores. After delivery had been accomplished, Quaker State paid the distributor for the product at a price also fixed by Quaker State. The National Accounts Program continued to operate in this manner at least until the time of trial.

Defendant American Oil was never a party to any arrangements or agreements with discount stores regarding either the advertisement of Quaker State motor oils or the retail prices charged by discount stores for Quaker State motor oils.

## DETECTION OF SALES VIOLATIONS AND ENFORCEMENT OF SALES RESTRAINTS

The evidence indicates that Quaker State engaged in various practices in order to determine whether its territorial and customer restrictions were violated. These practices included monitoring jobber purchases, interrogations of Quaker State distributors and American Oil jobbers, and product coding. Quaker State distributors and American Oil jobbers were assigned individual codes, each consisting of three digits. Until July 1966 the codes were applied to each carton of motor oils shipped to these distributors. When Quaker State discovered that some distributors, jobbers and discount stores were removing the codes from the cartons, and that cans of Quaker State motor oils were often displayed without the coded cartons, Quaker State began embossing the lids of the cans with its own purchase order numbers. There is also evidence that until 1965 Quaker State even coded cartons with marks visible only under a black light.

After the civil investigative demand was filed on Quaker State by the Justice Department, Quaker State ceased utilization of coding which identified the distributor to whom the oil was shipped. However, it is clear that, at least until 1970, Quaker State was continually attempting to discover which of American Oil's jobbers and which of Quaker State's distributors were increasing their volume of distribution by selling to other than approved accounts.

Enforcement of sales restraints took various forms. In several instances in both the Midwest Region and the East and South Region, Quaker State employees instructed distributors and jobbers that territorial and customer restrictions had to be complied with. Threats of reduced or completely terminated sources of supply of Quaker State motor oils were made at least as late as 1969. Such threats were in fact carried out in at least a few instances between 1963 and 1969. In a few cases Quaker State brought pressure to bear on American Oil jobbers by threatening enforcement of reduced maximum gallonage clauses in jobber contracts. Financial penalties in the amount of the profit lost by the distributor to whom the customer was assigned were assessed against at least one distributor and one jobber who sold outside of their assigned territories.

Unlike Quaker State, American Oil did not monitor purchases of Quaker State products by American subdistributors for the purpose of determining the identity of such subdistributors who made unusually large purchases. Neither did American Oil interrogate its subdistributors or jobbers to determine the location or identity of any of their customers for Quaker State products. Most of American Oil's subdistributors, including AFSCO, have never even discussed the location or identity of their Quaker State products customers with representatives of American Oil. American Oil has never placed any markings on cases or cans of Quaker State motor oils, has never received any information which would enable it to decode the markings which Quaker State put on its products, and has never received from Quaker State information concerning the purposes for which such markings were applied.

## AFSCO

In 1963 under Lawrence Plotkin, AFSCO's president and chief executive officer,

AFSCO began purchasing motor oils including Quaker State motor oils from another motor oil distributor. AFSCO sold these motor oils in discount stores and mass merchandisers in the midwest. In the summer of 1963, Plotkin was visited by Quaker State Division Manager Elmer Chocol who orally agreed to arrange for a limited supply of Quaker State motor oils to continue to reach Plotkin on certain conditions. Plotkin agreed to comply with certain stringent resale guidelines, including territorial and customer restraints and, in sales to discount stores, restrictions on volume, advertising and resale prices. Shortly thereafter, Quaker State representatives determined that Quaker State motor oils sold to AFSCO were being sold by discount houses located far outside AFSCO assigned territory. Plotkin was warned of the possible consequences of his transgression, and he assured Quaker State that there would be no further oil going out of his area.

In 1964 Plotkin was discovered to have violated the territorial and customer restrictions in at least six other instances and each time he was reprimanded. One of these incidents involved sales to Freed Oil. Following Chocol's informing Plotkin that tracing of codes on oil cans showed that AFSCO was supplying Freed Oil, AFSCO ceased selling Quaker State products to Freed Oil for approximately two years.

On December 15, 1964, AFSCO entered into a distributorship contract with American Oil. The contract included no express territorial restrictions but did assign "the Milwaukee County area" to AFSCO. This contract was renewed without substantial change in 1967. Although Quaker State was not a signatory to the contract, all negotiations leading to its execution and all subsequent orders for Quaker State motor oils placed under the contract, even those submitted to American Oil, were handled by Quaker State. During the term of the distributorship contract Quaker State instructed AFSCO to limit its sales of Quaker State motor oils to customers within its assigned territory and to refrain from selling Quaker State products to discount houses. At various times between 1964 and 1967 Chocol and other Quaker State representatives gave these instructions to Plotkin not only in general terms but also with respect to at least nine specific accounts, two of which Plotkin had proposed to begin servicing and seven of which AFSCO was already supplying. Following Plotkin's receipt of these instructions, AFSCO ceased pursuing the two proposed accounts and ceased supplying five of the seven existing accounts. Similarly, Quaker State representatives warned AFSCO to refrain from supplying Quaker State motor oils to other distributors or jobbers who might be expected to sell, in turn, to discount stores, and these warnings were effective in at least four cases.

The evidence establishes that during the term of AFSCO's distributorship contract it suffered some damage directly attributable to the attempts of Quaker State to enforce its system of territorial and customer restraints. This damage consisted of delays in filling AFSCO's orders, and reduction in supply of Quaker State motor oils. Although it is not clear on the present state of the record how much damage was the result of Quaker State's attempts to enforce restraints and how much was simply the result of product shortages beyond Quaker State's control, it has been established that some delays and some unfilled orders resulted from affirmative action of Quaker State employees attempting to enforce territorial and customer restrictions on AFSCO. Perhaps the most telling piece of evidence which supports this finding of fact is the October 31, 1965 memorandum written by Quaker State Division Manager Brennan. (Pl. Ex. 511). This document reveals not only the fact of delay in the filling of AFSCO's orders but also the illegal motivation for such controlled delays.

Other evidence supporting the finding of the fact of damage to AFSCO includes statistical evidence showing year to year variations in the quantities of Quaker State motor oils supplied to AFSCO by Quaker State. Although the quantities obtained by AFSCO in 1970, the year in which the instant lawsuit was filed, show a marked

increase over the quantities recorded for the previous years, we believe that the curtailments in supply experienced by AFSCO in 1968 and 1969 were substantial and have been shown to be causally connected to AFSCO's violations of Quaker State's system of restraints. We do not believe that defense testimony to the effect that the reduced supplies were the result of Quaker State's product shortage problem sufficiently explains all the curtailments experienced by AFSCO.

In the hope of obtaining additional quantities of Quaker State motor oils AFSCO began in 1967 to submit its orders directly to American Oil instead of sending them to Quaker State. This practice continued until the termination of AFSCO's distributorship contract in 1969. However, several of the orders which AFSCO submitted to American Oil between 1967 and 1969 were never filled; certain of these orders, especially those which were eventually to go to disapproved accounts, were simply returned to AFSCO with no action taken to fill them.

The evidence indicates that regardless of how orders were placed, Quaker State itself maintained exclusive control over the scheduling of all shipments of Quaker State to American subdistributors, including AFSCO. Any delays and unfilled orders were the result of Quaker State's, not American Oil's, actions. American Oil itself never attempted to enforce Quaker State's system of territorial and customer restraints by curtailing AFSCO's shipments. The evidence also establishes that American Oil did not use maximum gallonage provisions in its contracts with its subdistributors of Quaker State products, including AFSCO, for the purpose of curtailing shipments for violations of restraints. American Oil continued to process and forward to Quaker State orders placed by its subdistributors and to demand shipment thereof even though maximum quantities contained in subdistributor contracts had been exceeded.

During this same period (1967 to 1969) AFSCO attempted to purchase and did purchase additional quantities of Quaker State motor oils from various other distributors and jobbers. These unauthorized purchases were sometimes made at prices in excess of the prices which AFSCO paid for Quaker State products purchased directly from American Oil. When such unauthorized purchases came to Quaker State's attention, the sources of supply were contacted by Quaker State representatives and instructed to cease selling to AFSCO. Those who nonetheless continued to supply AFSCO began to experience delays in receiving their own supplies. By 1969 AFSCO discovered that, in addition to the curtailments it was experiencing in its supply from American Oil, it was no longer able to maintain its 1968 levels of supply from outside sources.

AFSCO's distributorship contract with American Oil was terminated by American Oil in September 1969. Beginning shortly after the termination Quaker State representatives undertook efforts to determine the identity of certain distributors and jobbers who had been supplying AFSCO, contacted those distributors and jobbers, informed them of the change in AFSCO's status and instructed them to discontinue supplying AFSCO. In at least two cases distributors ceased doing business with AFSCO following such conversations with Quaker State representatives.

FREED OIL

Freed Oil has never had a distributorship agreement with either of the defendants herein, but has purchased its Quaker State motor oil requirements from Quaker State distributors, American Oil jobbers and motor oil brokers, and has then sold the products to mass merchandisers and discount stores. The evidence shows that Quaker State representatives rejected the applications of Freed Oil for a distributorship agreement because Quaker State knew of Freed Oil's practice of selling to discount stores. In several instances when Quaker State and American Oil representatives were instructing their distributors and jobbers not to supply brokers who supplied discount stores specific reference was made to Freed Oil. Certain American Oil jobbers who refused to heed these warnings and

sold to Freed Oil later experienced reductions in quantity and delays in their receipt of Quaker State motor oils. In two cases jobbers who were supplying Freed Oil found that the renewals of their distributorship contracts provided for greatly reduced maximum gallonage allocations. The changes instituted in the 1967 contracts of both Frank Porter, Inc. and Jeffco Oil Company reduced by about 80% the gallonage of Quaker State motor oils which American Oil obligated itself to provide.

Quaker State refused to release to distributors and jobbers certain shipments which it discovered were to be resold to Freed Oil. On at least five occasions distributors and jobbers reported to representatives of Quaker State and American Oil the attempts of Freed Oil to make purchases.

The evidence establishes that territorial and customer restraints caused certain distributors and jobbers to limit the quantities of Quaker State motor oils which they supplied to Freed Oil at least in the years 1968 and 1969. These limitations caused Freed Oil to lose some sales to existing and potential customers, and establishes the fact of damages as to Freed.

### RIVERS BROS.

Rivers Bros. is an American Oil jobber whose chief wholesale customer for Quaker State products has been Freed Oil. Rivers Bros.'s distributorship contract with American Oil contained no express territorial restrictions, but attached to the contract was a map on which Rivers Bros.'s assigned geographic territory was outlined. Charles and Robert Rivers, officers of Rivers Bros., were instructed at the time of the execution of the contract not to sell Quaker State motor oils to customers outside the assigned region, to discount stores or companies which supplied discount stores, or to any customer within the designated territory who was already being supplied by another distributor.

In 1964 Rivers Bros. began to supply Freed Oil. In 1964 and 1965 Quaker State representatives questioned Robert Rivers in attempts to determine whether Rivers Bros. was selling Quaker State products to discount stores. In 1966 Quaker State began imprinting coded marking on cartons shipped to Rivers Bros. and, as a result of tracing these codes, later determined that oil sent to Rivers Bros. was being sold to discount stores or suppliers of discount stores.

At least in 1969 Quaker State caused substantial delays in deliveries of Rivers Bros.'s orders in order to restrict the flow of Quaker State products to Freed Oil. In 1968 and 1969 Quaker State significantly reduced the quantities of Quaker State motor oils shipped to Rivers Bros. When it became clear to Quaker State that Rivers Bros. was selling to Freed Oil, Quaker State representatives returned or refused to accept orders for Quaker State motor oils placed by Rivers Bros. which resulted in damage to Rivers Bros.

### EVASIONS OF DEFENDANTS' RESTRAINTS

All three plaintiffs attempted to find methods of avoiding detections of their violations of defendants' system of restraints.

AFSCO removed coded markings imprinted on cartons of Quaker State motor oils which it received, if such markings had not already been removed by the distributor who made the sale to AFSCO. AFSCO officer Plotkin attempted to mislead representatives of American Oil and Quaker State who questioned him about his violations of defendants' restraints.

Freed Oil removed codes imprinted on cases of Quaker State motor oils it received, if such codes had not been removed previously by other distributors. Freed Oil truck drivers when taking delivery of Quaker State products from certain distributors or jobbers sometimes covered the "Freed Oil" name on their trucks, sometimes used unmarked trucks and sometimes made the pickups in secluded areas. Rivers Bros. removed coded markings on cartons of Quaker State products it sold to Freed Oil and assisted Freed Oil employees in removing codes.

## CONCLUSIONS OF LAW

### A. *Quaker State's Liability*

 Territorial restrictions, defined as "promise[s] by the buyer that he will not sell the goods outside a specified area or to customers who reside or have their place of business outside of that area,"[2] are per se violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, once the manufacturer has parted with the risk of loss. *United States v. Arnold Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 [1967]. Price fixing or resale price maintenance have been considered *per se* violations of that section since *United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 [1927]. The only question before this court, then, is whether the above findings of fact show that the defendants Quaker State and American Oil or either of them was engaged in a combination, contract or conspiracy to use either of these proscribed business practices.

Both defendants base their defense to the charge by these plaintiffs that territorial restrictions were imposed on all the plaintiffs on the argument that the facts do not show the kind of "firm and resolute" enforcement of territory-limiting clauses by the defendants which would justify a finding of liability. They point to language in *Colorado Pump & Supply Co. v. Febco, Inc.*, 472 F.2d 637 [10th Cir. 1973], cert. den. 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965, and other cases following *Schwinn* which hold that without evidence of firm and resolute enforcement, the mere description in a distributorship contract of a primary market territory and the absence of sales outside that territory may not establish a Sherman Act violation.[3]

 Before late 1966, Quaker State did require its distributors to sign contracts which contained clear territorial restrictions. After the government began its investigation of Quaker State's marketing practices in 1966, Quaker State deleted this clause from its contract forms and undertook a program to educate its representatives in the requirements of the anti-trust laws. However, after 1966, the form contracts still contained maximum gallonage provisions which the court has already found showed a rough correlation to the sales its distributors had been making under the old customer and territory restrictions. Under these circumstances, the deletion of the territorial restriction clauses is not sufficient to prove termination of the previously existing practice of enforcing territorial restrictions, *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894 [5th Cir. 1973], cert. den. 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 [1973]. Nor are we convinced, in view of the testimony in the record establishing that Quaker State did seek to limit its distributors, as well as those distributors who made their purchases indirectly from Quaker State through American Oil, to sales within certain areas and to certain classes of customers who would not discount the products as an ordinary business practice, that Quaker State's instructions to its representatives about the need for compliance with the anti-trust laws can sustain a defense on the merits. The evidence on which we rely in making the finding that Quaker State continued after 1966 to enforce unwritten territory and other restrictions designed to maintain resale prices is the following:

(1) Maximum gallonage provisions in distributorship contracts were often enforced to allow a distributor to purchase only sufficient quantities of Quaker State motor oils to supply approved customers, that is, customers other than discount stores or those who sold to discount stores, within that distributor's assigned territory.

(2) Quaker State attempted to accord "advance reservation dates" and make prompt delivery of orders only to those distributors who complied with customer and territorial restrictions.

---

2. Note, "Restricted Channels of Distribution Under the Sherman Act," 75 Harv.L.Rev. 795, 796 [1962].

3. Note, "Area of Primary Responsibility Clauses and the Antitrust Laws" 35 U. of Pgh.L.Rev. 671 [1974].

(3) Deletion of territorial restriction clauses from distributorship contracts generally was not accompanied by instructions from Quaker State representatives that distributors were free to sell outside of assigned territories.

(4) Distributors who placed large orders sometimes had those orders filled by Quaker State only after demonstrating that the retailers to whom the oil was to be sold were approved accounts.

(5) Among Quaker State's uses of its product coding scheme was the identification of distributors and jobbers who were violating Quaker State's sales restrictions.

Of course, as the court in *Wilson v. I. B. E. Industries Inc.,* 510 F.2d 986, 988 [5th Cir. 1975] held "Schwinn requires proof of something more than an agreement to cut off one or two customers for reasons that have nothing to do with the supplier's pattern of distribution or the demands of competition." However, in this case Quaker State has done far more than the defendant in *Wilson,* supra, or in *Colorado Pump & Supply Co. v. Febco,* supra. Quaker State's pattern of enforcement here—meetings with distributors and threats against distributors who failed to conform to territorial or price policies—is much closer to that shown in *Adolph Coors Co. v. FTC,* 497 F.2d 1178 [10th Cir. 1974], cert. den. 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 and *Copper Liquor, Inc. v. Adolph Coors Company,* 506 F.2d 934, 944 [5th Cir. 1975], rehearing den. 509 F.2d 758. The facts here show what the Fifth Circuit in *Copper Liquor,* supra, called "loose contractual designations and circumstances from which an understanding to adhere to the previous restrictions [on territories] could be inferred," and constitutes a *per se* violation of the Sherman Act.

■ We also find that Quaker State's implementation of its National Accounts Program has violated the Sherman Act in that it has amounted to a vertical price-fixing scheme. A telling fact in this determination of illegality is the existence, well supported by the evidence, of Quaker State's intent to restrain intraband retail price competition.

The sale and resale device of the National Accounts Program involves independent distributors in Quaker State's efforts to control resale prices of its products. The effect of the conspiracy is to control the source and price of Quaker State products eventually resold to discount stores. Furthermore, Quaker State did not make the program available to all discount stores. Rather, it accepted as NAP accounts only or primarily discount stores which had obtained substantial supplies of Quaker State products even in pre-NAP days.

## B. American Oil's Liability and Involvement in Conspiracy

■ We accept American's position that it was Quaker State, not American Oil, that filled or failed to fill plaintiffs' orders and that American Oil itself sought in various ways to maximize shipment to its subdistributors. The evidence for showing American Oil's participation in Quaker State's efforts to control sales of its products by limiting the price and territorial options of retail dealers does not establish a consistent pattern of enthusiastic conspiracy. However, American Oil's jobbers in several regions were required as late as 1966 to execute printed contract forms with territorial restriction clauses. American Oil also agreed with Quaker State to include maximum gallonage provisions in American's contracts with its jobbers. After 1966 American Oil representatives discussed with Quaker State employees the problems caused by Quaker State distributors' solicitation of American dealers. Finally, and most tellingly, American Oil representatives, aware of Quaker State's attempts to shut off shipments to Freed Oil, participated in the questioning of Rivers Bros. about its dealings with Freed Oil and warned Rivers Bros. not to continue such dealings.

In his recent opinion in *Pearl Brewing Co. v. Anheuser-Busch, Inc.,* 339 F.Supp. 945 [S.D.Tex.1972], Judge Bue thoroughly reviewed the legal history of the interpreta-

tion of the phrase "contract, combination . . . or conspiracy" in 15 U.S.C. § 1, as follows:

In construing the Act, it was early recognized that resort must be had to the common law in order to ascertain the meaning of the terms . . . and to determine whether or not particular acts come within the ambit of this section . . . These three terms have acquired somewhat unique meanings under this statute which distinguish them from traditional definitions normally employed in other areas of the law. Thus, while the term "contract" is commonly defined as an agreement, express or implied, based upon a certain consideration, to perform a particular act, these traditional contractual requirements are not to be employed in isolation when making a determination in this statutory context; indeed, the case authorities teach that formal contract principles should not be literally applied to ascertain if the particular conduct in question is within the framework of Section 1 . . . The second statutory term, "combination", is normally defined as a union or association of two or more persons for the achieving of a common object . . . However, a combination can also be defined as a unilateral act committed by a first party in dealing with a second party wherein the latter concurs in the former's acts and related policies with knowledge of their intended effect . . . The third statutory term, that of "conspiracy", is readily defined as a joint undertaking extending over a period of time with a common purpose, intent or design resulting from a combination or agreement, express or implied, to accomplish an unlawful end or to accomplish a lawful end by an unlawful means . . .

Despite the somewhat obvious dissimilarities, these three terms are in accord to the extent that all require some consciousness of commitment to a common scheme or to some type of joint action. (citations omitted).

339 F.Supp. at 950–951

American Oil in this case obviously had no independent policy of enforcing territorial or price restrictions on its subdistributors. However, American did have a strong interest in maintaining good relations with Quaker State. The facts show that American Oil was at all times ready to go along with Quaker State's policies here found to have been illegal and, on request, to help Quaker State cope with individual dealers who did not comply with these policies. This willing adherence to an illegal scheme is sufficient to establish American's liability. *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161, 68 S.Ct. 915, 92 L.Ed. 1260 [1948], and *Milgram v. Loew's, Inc.*, 192 F.2d 579, 583–84 [3rd Cir. 1951].

## C. Limitations of Damages

The complaint in this case was originally filed on May 26, 1970. The relevant statute of limitations, 15 U.S.C. § 15b allows a complainant four years to file his suit. However, 15 U.S.C. § 16(b) tolls this statute of limitations during the pendency of any government action and for one year thereafter for "every private right of action . . . based in whole or in part on any matter complained of" in that government antitrust suit.

On the face of this section, a private party who brings suit for a conspiracy against which the Government has already brought suit is undeniably basing its claim in whole or in part upon the matter complained of in the Government suit, even if the defendant named in the private suit was named neither as a defendant nor as a coconspirator by the Government. If, that is, the government sues only certain conspirators, but also alleges and proves during trial that others were conspirators, the fact of the tolling of the statute against those so proved but not sued can hardly be denied. Nor could tolling be denied if a defendant had never been shown to be a conspirator by the evidence offered in the earlier Government suit, but then had been proved to be such in the subsequent private suit. *Zenith Radio Corp. v. Hazel-*

*tine,* 401 U.S. 321, 335, 91 S.Ct. 795, 804, 28 L.Ed.2d 77 [1971].

The action which plaintiffs claim tolled the statute in this case is *United States v. Quaker State,* Civil Action No. 56–69 Erie, Western District of Pennsylvania, filed on June 23, 1969 and concluded by a consent judgment approved by the court on July 24, 1969. This action was brought by the United States against Quaker State and alleged a conspiracy dating from 1952 to fix and stabilize prices for the sale of the defendant's products, to allocate territories for sale of the products by distributors, to allocate customers and to prevent sales to customers who sold the products at discount prices. Obviously, the plaintiffs' case here alleges the same kinds of acts and is therefore based "in whole or in part," on the same cause of action as the government suit. Because American Oil has been found to have participated in the same conspiracy, the cause of action here was tolled against it as well as against Quaker State. Thus, the plaintiffs may claim damages from and after June 24, 1965.

However, as will be found below, AFSCO may not recover any damages from and after September of 1969, when its subdistributorship was cancelled by American Oil.

## QUAKER STATE'S COUNTERCLAIM

■ By the expenditure of substantial money and effort in advertisement and promotion of its products, Quaker State has developed a favorable and widespread reputation as a refiner, manufacturer, distributor and seller of high quality motor oils, automobile undercoating products and related petroleum based products. Quaker State's business and goodwill have substantial value.

The evidence establishes that AFSCO deliberately and knowingly misbranded at least 17 fifty-five gallon drums of Quaker State motor oil and at least 4 drums of "Quakerkoat" automotive undercoating, infringing on Quaker State's applicable registered trademarks. The evidence further shows that AFSCO took deliberate and conscious steps to conceal the aforesaid misbranding and sold the misbranded products as genuine Quaker State products.

We find that Quaker State holds valid federal trademark registrations to the name "Quaker State" both on motor oil and automobile undercoating. We find that the customers to whom AFSCO sold the misbranded drums were in fact deceived. Therefore, AFSCO has violated Section 32(1)(a) of the Lanham Trademark Act [15 U.S.C. § 1114(1)(a)]. *Villager, Inc. v. Dial Shoe Co.,* 256 F.Supp. 694, 700 [E.D.Pa.1966].

We also find that the same facts constitute a violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) (the federal unfair competition claim of Quaker State) as well as common law unfair competition. See *Villager,* cit. *supra,* at p. 703.

## AMERICAN OIL'S COUNTERCLAIM

On September 10, 1969, the United States District Court for the Northern District of Illinois entered a permanent injunction against AFSCO effective March 10, 1970. AFSCO was enjoined from using the word "American" on any labels or containers for automobile service products except that AFSCO would be permitted to use its full corporate name "American Fuel and Supply Co. Inc." on such labels or containers where the use amounted to "only . . . a corporate signature line and only in a uniform size, type and style . . . AFSCO was further enjoined from using the word "American" in advertising or promotion of automotive service products including motor oil and windshield washer antifreeze except as in the corporate signature as limited above.

We find that AFSCO, as late as March 1971, in violation of the terms of the injunction continued to market its private brand of windshield washer antifreeze and solvent under the brand "American". We find that AFSCO, in violation of the terms of the injunction, continued to use until the time of trial of this case, the name "American" in signs on its retail facility and on its trucks in the same color and design as American Oil Company's symbols, which

created the impression that the products which AFSCO markets were manufactured, promoted or sold by American Oil. The evidence also established that trucks owned by other parties and used by AFSCO for transporting motor oil have been marked "American" or "Buy American" in violation of the injunction. We find that on dates after March 10, 1970, AFSCO continued to use order forms and labels which violated the term of the injunction.

■ We find that plaintiff AFSCO and its principal Lawrence Plotkin have continued to engage in a deceptive practice already found illegal and have thereby demonstrated an attitude with regard to the district court's injunctive order which renders punitive damages appropriate.

In making this ruling, this court is not finding that AFSCO was in contempt of the permanent injunction entered against it in Illinois. Rather, the court is using the terms of that injunction to establish both the validity of American Oil Company's right to the "American" trademark and the knowledge of AFSCO that it had no right to use that trademark or any mark resembling it.

### TERMINATION OF AFSCO'S SUBDIS-TRIBUTORSHIP CONTRACT

■ AFSCO's distributorship contract with American Oil was terminated by American Oil in September 1969, following joint consideration by American Oil and Quaker State representatives of several factors including trademark infringement, misbranding of Quaker State products, AFSCO's continuing practice of supplying customers outside of its assigned territory and AFSCO's continuing practice of supplying those who in turn supplied discount houses. We find that the final decision to terminate the contract was made by American Oil and was primarily motivated by AFSCO's misbranding activities. We do not find the primary motivation illegal and we, therefore, conclude that the termination did not illegally restrain trade. See *Jos. E. Seagram & Son, Inc. v. Hawaiian Oke & Liquors Inc.,* 416 F.2d 71 [9th Cir. 1971]; *Ark*

*Dental Supply Co. v. Cavitron Corp.,* 323 F.Supp. 1145 [E.D.Pa.1971], aff'd 461 F.2d 1093 [3rd Cir. 1972]. We find the termination well justified by the deceptive practices of AFSCO. Plaintiff contends that the primary motivation for the termination was AFSCO's violation of defendants' system of restraints. However, because Quaker State knew of AFSCO's sales to discount houses as early as 1963 and because there is no evidence of prior serious consideration of termination, we conclude that AFSCO's disapproved sales were not the primary motivation for termination of its distributorship.

### FINAL CONCLUSIONS

In accordance with the above findings of fact and conclusions of law, the court finds that Defendants American Oil and Quaker State are jointly liable to all Plaintiffs herein for antitrust violations. The court further finds that Plaintiff AFSCO is liable to both Defendants on their individual counterclaims. An order will be entered to this effect and a time will be set for hearing on the issue of damages on both the claims and the counterclaims.